LOUIS P. FEUCHTBAUM (State Bar No. 219826)
E-Mail:      *lfeuchtbaum@sideman.com*
SIDEMAN & BANCROFT LLP
One Embarcadero Center, Twenty-Second Floor
San Francisco, California 94111-3711
Telephone:    (415) 392-1960
Facsimile:    (415) 392-0827

NANCI L. CLARENCE (State Bar No. 122286)
E-Mail:      *nclarence@clarencedyer.com*
CLARENCE, DYER & COHEN, LLP
899 Ellis Street
San Francisco, CA 94109
Telephone:    (415) 749-1800
Facsimile:    (415) 749-1694

Attorneys for Raymond A. Grinsell

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA , <br><br> Plaintiff, <br><br> v. <br><br> RAYMOND A. GRINSELL, <br><br> Defendant. | Case No. 3:14-cr-00534 CRB-2 <br><br> **SENTENCING MEMORANDUM** <br><br> Judge:   Honorable Charles R. Breyer <br> Courtroom 6, 17th Floor <br> Date:     April 26, 2018 <br> Time:    1:30 p.m. |

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION.................................................................................................. 1

II.     BACKGROUND.................................................................................................. 2

III.    HEALTH ISSUES................................................................................................ 7

        A.      Chronic Health Conditions.................................................................... 7

        B.      Cardiovascular Disease ......................................................................... 8

IV.     HEALTH CARE UNDER THE Bureau of Prisons ......................................... 11

        A.      Designation to an Appropriate Facility .............................................. 12

        B.      Medications Administered by the BOP................................................ 15

        C.      Chronic Care ....................................................................................... 16

        D.      Limited Ability to See a Specialist For Serious Medical Deficiencies ................... 17

        E.      The Likely Effect Upon Mr. Grinsell of Medical Care Available Through BOP ............................................................................ 18

V.      LEGAL JUSTIFICATION FOR A NON-CUSTODIAL SENTENCE .............................. 19

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**I.      INTRODUCTION**

Raymond Grinsell will appear for sentencing after having pleaded guilty, pursuant to a plea agreement, to two felonies for participating in bid rigging at foreclosure auctions.  By the terms of that plea agreement, Mr. Grinsell is bound by the sentencing guidelines agreed to, but he is permitted to argue relevant factors under 18 U.S.C. § 3553 that could affect a variant sentence. In doing that, this Sentencing Memorandum will focus primarily upon concerns regarding the severe effects that we believe incarceration will have upon Mr. Grinsell due to his poor health and age.

We anticipate that, in the event of a custodial sentence, Mr. Grinsell's poor health would limit the places that the Bureau of Prisons would designate for his incarceration to those that would move him far away from his family, and that would likely exclude him from being in a camp, for which he would otherwise be qualified.  However, our greatest concern is that, given the instances in the past year when Mr. Grinsell's health suddenly deteriorated and he required hospitalization, the medical care he would receive from the Bureau of Prisons would be significantly inferior to the medical care he has at home, and that this inferior care could have severe unintended consequences.  This could potentially cause the effects of a custodial sentence to be substantially disproportionate to the harm Mr. Grinsell caused through his crimes.

Mr. Grinsell has been consumed with anxiety about this case since January 11, 2011, when the Government's investigation first became publicly known.  Since that date, Mr. Grinsell has lived with daily worry about how this would affect the lives of his family members, and his employees.  He feels shame that an otherwise exemplary life could be now judged by others as being that of someone who was successful solely because he was a cheat.  Over this seven year period of time, Mr. Grinsell's health has been in decline, causing him to fear whether he would outlive this case.  This is unfortunate because that prolonged period of time was unnecessary.

More than three years ago, prior to the indictment, Mr. Grinsell would have pleaded guilty to the bid rigging charges that he has since pleaded guilty to.  However, our belief that the Government was incorrect as a matter of law in insisting that Mr. Grinsell had also committed mail fraud, and in insisting he also plead to two counts of mail fraud made any such early

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1 resolution not viable. Since pleading guilty, Mr. Grinsell has cooperated fully with the

2 government to assist it in every manner he is able.

## II.    BACKGROUND

4 The offenses to which Mr. Grinsell pleaded guilty do not reflect his character, nor his life.

5 To the contrary, he has lived an exemplary life that has been devoted to the well-being of his

6 family, friends in need, and to his employees.   This background is provided to supplement the

7 extensive personal information that Mr. Grinsell provided to probation, and which has been

8 incorporated into the Pre-Sentence Report ("PSR").

9 Ray Grinsell has lived his whole life in the Bay Area. His father worked in the Sausalito

10 shipyards and then became a used car salesman. His mother was devoted to Mr. Grinsell and his

11 younger brother Alfred ("Fritz"). However, Mr. Grinsell's family life was difficult. His father

12 was emotionally detached and an alcoholic. As his mother began dealing with difficulties in her

13 marriage, she became withdrawn. Money was always tight. Mr. Grinsell reacted to this situation

14 by working hard and becoming self-sufficient. He could not afford tennis lessons, so he practiced

15 endlessly, taking tips from older players, becoming accomplished, and beginning what would

16 become a life-long passion. He worked all throughout high school, and still graduated third in his

17 class from Tamalpais High School. He paid his way through UC Berkeley by working several

18 jobs.

19 From the time he was a child, Mr. Grinsell took responsibility to care for his family. Until

20 the time that they each died, Mr. Grinsell's mother and his brother Fritz repeatedly told Gale

21 Grinsell stories about how Mr. Grinsell worked from the time he was twelve years old and

22 contributed his earnings to help support the family. (Declaration of Louis P. Feuchtbaum

23 ("Feuchtbaum Decl."), Ex. A, p. 1.)

24 This commitment to helping others is a common theme in Mr. Grinsell's life. A broader

25 selection of letters that people who know Mr. Grinsell have written to the Court attest to this and

26 to Mr. Grinsell's good character. (*See* Feuchtbaum Decl., Ex. B.) A few of the those instances

27 that serve as examples:

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

- When Mr. Grinsell's niece Gina lost a baby due to being in denial that she was pregnant and was charged with a felony, Mr. Grinsell provided critical financial support to post bail and to help fund her defense. (Feuchtbaum Decl., Ex. C, p. 1.) More importantly, Mr. Grinsell visited Gina in prison, wrote letters, and right before she was released, Mr. Grinsell offered her a job at his real estate office. *Id.* Under Mr. Grinsell's tutelage, Gina has now graduated college, she has a real estate sales license, she has passed the test to become a real estate broker, she is married, and she just recently purchased her own home. As Gina describes the importance of this: "[w]ithout Ray's help, I am not sure what my family would have done or where I would be today." *Id.*

- Mr. Grinsell's son, Scott, discusses the deep love from his father who "was a wonderfully involved parent and [a] loving husband[.]" (Feuchtbaum Decl., Ex. R, p. 1.) Scott noticed how Mr. Grinsell's upbringing with a severely alcoholic father and a family "was infected with the ugliness and dysfunction that too often accompanies that disease" motivated Mr. Grinsell to provide a different life for Scott and his mother. (*Id.*) Scott credits his father and mother for helping him overcome severe dyslexia to graduate "from Williams College at the top of [his] class, earn[] a master's degree from Oxford as a Marshall Scholar, [] graduate[] from Yale Law School" and serve as a law clerk on the U.S. Supreme Court. (*Id.* at 2.) Scott notes the effect that this case has had on Mr. Grinsell:

  > It is difficult to watch a parent who understood himself as a self-made man and who had such pride in what he had built, to lose all of that at the end of his life. For my mother, I believe this change in my father has been devastating. In her own way, she is facing the reality that the life they created together has been damaged. Watching my father endure a prison sentence, particularly given his medical condition, would further deepen the suffering that she has already experienced. Like my father, she is in her middle 70s, and she has no immediate family living in the Bay Area. Apart from the emotional impact it would cause, a prison sentence would also mean the loss of her principal caretaker and companion. (*Id.*)

- Mr. Grinsell has been a valued mentor to people around him. One of these people, Bowman Leong, credits Mr. Grinsell with providing wise guidance that helped him heal wounds with members of his family. (Feuchtbaum Decl., Ex. D, p. 1.) Realizing the

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

absence of family in Bowman's life, Mr. Grinsell invited him to family functions and made Bowman feel as if he were a member of Mr. Grinsell's own family. (*Id.* at 2.) As Bowman describes: "I have always thought that this was such an incredibly selfless thing to do, because it gave me such a powerful sense of support, belonging, and inclusion." (*Id.*) Bowman credits Mr. Grinsell with providing crucial guidance and support in helping Bowman launch a successful business career. (*Id.*) Then later, after Bowman realized he did not like that career and wanted to become a photographer, Mr. Grinsell was a stalwart champion for him in that endeavor. (*Id.*)

- Mr. Grinsell's generosity has even touched people with whom he did not have a close personal relationship. Cynthia Chang describes that when she lost her home during the foreclosure crisis, she contacted Mr. Grinsell shortly after he had undergone major surgery. (Feuchtbaum Decl., Ex. E, p. 1.) Mr. Grinsell provided Cynthia with advice and offered to put up his own money for Cynthia to use in repossessing her home. (*Id.*)

- In another incident, Mr. Grinsell purchased a home at a foreclosure sale and learned that the home had been foreclosed after the owner had died intestate. Mr. Grinsell realized that the decedent's sister was entitled to the proceeds from the sale, which had been placed in escrow, but she seemed lost in what to do about it. Mr. Grinsell assisted the sister in finding an attorney so she could claim the estate. (Feuchtbaum Decl., Ex. S, p. 1.)

- And yet another similar incident, as described by someone who Mr. Grinsell barely knew at the time, Jim Hickey:

  > About seventeen years ago, Ray helped me tremendously, when he had no obligation to do so and did not know me very well at the time. I was arrested as the result of a domestic dispute with a girlfriend who claimed, falsely, that I have physically abused her. I was in the San Francisco jail and had no one to bail me out. After being turned down by a number of people, I called Ray, who came through for me. He put up twenty-five thousand dollars for my release.

  > Ray told me afterwards that at the time he put up the money, he didn't even know where I lived. It was [sic] very kind thing for him to do.

(Feuchtbaum Decl., Ex. F, p. 1.)

Mr. Grinsell's friends describe him as someone who is not only generous, but loving and compassionate without expectations of getting anything in return:

- Michael Larson describes that he recently lost his wife after forty years of marriage, and how meaningful was Mr. Grinsell's presence:

> When we were last together with the Grinsell's [sic] in Kona in March 2017, Barbara's health was severely compromised. Despite the fact that Ray has faced his own problems, he took the time and effort to care and watch over Barbara during what was an important vacation for him. We were shocked to learn that Ray is accused of committing a crime in his occupational field that he knew and loved. We were not surprised to see Ray set aside his own problems and look out after others. Ray Grinsell is one of most compassionate, understanding and loving men that we've known.

> My late wife and I respected Ray Grinsell not only for looking after us, but for looking after others. Ray respected even the most ordinary staff in the resorts where we stayed during these vacations. He provided career advice and followed up when people were in trouble to make sure that they recovered and made their way out of trouble.

(Feuchtbaum Decl., Ex. G, p. 1.)

Perhaps some of the most poignant testimonials about the type of person who Mr. Grinsell is come from his employees. Many of these people are immigrants, some with limited formal training that would make finding alternative employment a difficulty.

- As described by Rene Vasquez, a 65-year old man who emigrated to the United States in order to escape war in El Salvador:

> Ray, this guy bring me to the company and he told me this is Ray the boss. After I meet Ray, I got small Jobs, doing the painting. I was working for Goodwill, but I quit that to start working full time for Ray doing painting, but painting the whole house. I am been working for Ray for about 25 years until today.

> * * *        * * *

> When I quit Goodwill and start working for Ray my life got better a lot— it changed my life until today. If not for Ray giving me a job, I not have what I have. With Ray I could see that I could make more

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

money that not with Goodwill. My position was going up. Ray will add to money he pays me $200 or $500 more for a Job. Before Ray, people who I worked for don't treat me good. The way that Ray talk to people, the way that Ray trust people, the way that Ray treat people is not like any other boss. God bless Ray. If I could take his position, I go to prison for Ray. People deserve him. People need him.

(Feuchtbaum Decl., Ex. H.)

- Beatrice Yuen, Mr. Grinsell's bookkeeper for the past twenty-two years, provides titles of the great virtues, and then provides a paragraph beneath each title to describe how that virtue applies to Ray: "Humble, simple life but hardworking;" "Understanding and kind to me and my family;" "Accepts other's weaknesses and gives encouragement;" "Extends forgiveness;" "Provides sincere help with unconditional return;" "Prioritizes the safety of his staff;" "Merciful and caring to others;" "Trusts others;" "Peaceful and patient;" "Never gives up, even during struggles;" "Independent;" "Shares his joy with his staff and honors them;" "Enjoys simple pleasures and is family oriented;" "Selfless and not focused on monetary value." (Feuchtbaum Decl., Ex. I.) She concludes her letter with "My request:"

Ray is in his mid-seventies now. He has been working very hard through his life. He lives a simple life. He never thought of choosing a luxurious life. He has consistently offered help without expecting anything in return in many circumstances. He always has a cheerful and good heart to work hard and to help others. Since Ray also has fought against heart problem and other health issues, I sincerely request Judge Breyer to take careful consideration of Ray's goodness and acts in the past before making the judgment on Ray. Knowing Ray for over 22 years, he shares with us in both joy and sorrow. I will also share the same as he has shown, his joy and sorrow. I pray and hope to look forward that Ray can receive a very fair judgment. A judgment that allows Ray to stay in his stable health, so he could continue to do what he had done in the past as loving his family, caring and helping others in many ways, keeping his passion on work, supporting his staff with jobs, showing his kindness and goodness to people around him. Judge Breyer, I thank you for your good judgment!

(*Id.* at 4-5.)

- Mr. Grinsell's niece, Gina, seems to sum up the sentiments of Mr. Grinsell's employees:

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> The office is Ray's other family. Everyone who works at the office has worked there for a number of years, and we are a tight knit group. We count on each other for support, and continue to support each other. Ray has changed the careers and lives of everyone in this office, and he is always there if anyone needs him in any way. If Ray was to be incarcerated, a lot of people who depend on Ray for jobs would lose their livelihoods. (Feuchtbaum Decl., Ex. C, p. 1.)

## III.   HEALTH ISSUES

Ray Grinsell is a 75 year old man who has significant health issues.  We are concerned that the BOP's accommodations for treatment of these issues would cause Mr. Grinsell's conditions of confinement to be much harsher than warranted, that harsh conditions of confinement are likely to exacerbate his illnesses, that changes in medications, which Mr. Grinsell currently relies upon for his survival, could have severe adverse consequences, that the available care from the Bureau of Prisons is substantially inferior to the quality of care he normally receives, and that all of these factors would contribute to further decline that may impact Mr. Grinsell's ability to survive any period of custody.

### A.    **Chronic Health Conditions**

Mr. Grinsell has several chronic conditions that adversely affect his health.  He suffers from agoraphobia with panic disorder.[1]  (Feuchtbaum Decl., Ex. J, p. 1.)  He has chronic kidney

---

[1] It is worth noting that Mr. Grinsell's history of anxiety and panic attacks occurred prior to a time when he would have experienced anxiety from the stress and uncertainty of being under investigation and they continue to the present.  His medical records indicate a history of panic attacks and anxiety as existing during February 2010. (Feuchtbaum Decl., Ex. T, p. 2.)    As described in the PSR, the effects of this have been significant:

> [Mr. Grinsell] has never been housebound because of these issues, but has suffered panic attacks in different situations. This causes him to sometimes be overwhelmed with an impending sense of doom and severe trouble sleeping in strange places. When traveling, it is not uncommon to be unable to sleep for extended periods of time. PSR, p. 19.

As Mr. Grinsell reported to Probation in his Form 1, when traveling, he and his wife Gale often seek to stay in the same hotel, and in the same room as on previous trips to lessen his anxiety.  During 2017, a doctor recommended he use medicinal marijuana as treatment for anxiety.  However, Mr. Grinsell did not believe it helped and ceased its use.  PSR, ¶ 63.

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

disease with impaired kidney function and increased creatinins.  (Feuchtbaum Decl., Ex. K, p. 2.)  This results from hypertension and atherosclerosis.[2]  (*Id.*)  He has a history of various skin cancers: melanoma, basal cell carcinoma and squamous cell carcinoma.  (Feuchtbaum Decl., Ex. L, p. 1.)  Mr. Grinsell also has diabetes mellitus, which is being controlled through medication.  (*Id.*, at 2.)  However, the most significant issues affecting Mr. Grinsell's health arise from his worsening cardiovascular disease.  Unfortunately, this has an amplifying effect as it aggravates others of his chronic conditions that can become life threatening.

   **B.   Cardiovascular Disease**

   Ray Grinsell suffers from severe cardiovascular disease.  (Feuchtbaum Decl., Ex. K, p. 1.)  He has a long history of hyperlipidemia, which is being treated by medication.  (*Id.* at 2.)  Both of his carotid arteries have a blockage that is estimated to be as great as 30% to 35% (bilateral carotid plaque stenosis).  (*Id.*)  The walls of his heart's main pumping chamber have become thickened (left ventricular hypertrophy) and he has biatrial enlargement.[3]  (*Id.*)  He has grade 2 diastolic dysfunction.[4]  (*Id.*)  He has mild pulmonary hypertension.[5]  (*Id.*)  His inferior vena cava has

---

[2] This disease, "also called chronic kidney failure, describes the gradual loss of kidney function." https://www.mayoclinic.org/diseases-conditions/chronic-kidney-disease/symptoms-causes/syc-20354521.  "Treatment for chronic kidney disease focuses on slowing the progression of the kidney damage, usually by controlling the underlying cause. Chronic kidney disease can progress to end-stage kidney failure, which is fatal without artificial filtering (dialysis) or a kidney transplant." *Id.*

[3]  The "enlarged heart muscle loses elasticity and eventually may fail to pump with as much force as needed."  Complications from this condition include sudden cardiac arrest. https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/symptoms-causes/syc-20374314.  Untreated sleep apnea is an aggravating factor for this condition. https://www.mayoclinic.org/diseases-conditions/left-ventricular-hypertrophy/diagnosis-treatment/drc-20374319.

[4] Diastolic dysfunction "is increasingly viewed as being influential in precipitating heart failure[.]" https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2889378/.

[5] This type of high blood pressure affects arteries in the lungs and on the right side of the heart. https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697.  "Some forms of pulmonary hypertension are serious conditions that become
(footnote continued)

1  become dilated.[6]  (*Id.*)  He has mild aortic regurgitation.[7]  (*Id.*)  He suffers from episodes of atrial

2  fibrillation, which has proven difficult to treat.[8]  He has congestive heart failure, which has

3  recently resulted in life-threatening situations where Mr. Grinsell has required emergent care.

4  Mr. Grinsell's worsening cardiac condition has led to numerous hospitalizations.  During

5  2010, Mr. Grinsell underwent surgical repair to his mitral valve at the Mayo Clinic.  During

6  August 2011, Mr. Grinsell began experiencing shortness of breath and chest discomfort due to

7  angina.  (Feuchtbaum Decl., Ex. L, p. 1.)  These symptoms led to an examination during which it

8  was determined that he was suffering from congestive heart failure, and he was treated for

9  pericardial effusion.[9]  (*Id.*)  During February 2012, Mr. Grinsell was diagnosed with triple vessel

---

11  progressively worse and are sometimes fatal." *Id.*

12  [6] A dilated inferior vena cava is associated with worse survival in men, independent of whether they suffer other comorbidities.  https://www.ncbi.nlm.nih.gov/pubmed/16504642.

13  [7] This condition occurs when the aortic valve does not fully close, which allows some of the blood that was pumped out from the heart to leak back into the heart's main chamber. https://www.mayoclinic.org/diseases-conditions/aortic-valve-regurgitation/symptoms-causes/syc-20353129.  As this condition worsens, it could lead to swelling of ankles and feet, arrhythmias, and heart murmurs, among other complications.  *Id.*

16  [8] Initially, Mr. Grinsell's atrial fibrillation was successfully treated with amiodarone. (Feuchtbaum Decl., Ex. K, p. 1.)  Unfortunately, Mr. Grinsell was unable to tolerate that medication and it had to be discontinued.  (*Id.*)  He experienced other episodes of atrial fibrillation, which eventually converted back to a normal sinus rhythm.  (*Id.*)  However, this condition worsened and in February 2017 Mr. Grinsell began requiring more aggressive treatment for atrial fibrillation.  (*Id.* at 2.)  Initially, he was successfully treated by electrical cardioversion. *Id.*  However, during December 2017, Mr. Grinsell's episodes of atrial fibrillation grew worse. (Feuchtbaum Decl., Ex. M, p. 1.)  His cardiologist had intended to treat this with cardiac ablation, but discovery of a blood clot in Mr. Grinsell's heart and recognition that he was critically ill due to congestive heart failure prohibited that treatment.  (*Id.*)  During January 2018, Mr. Grinsell was readmitted to the hospital for treatment of atrial fibrillation.  (Feuchtbaum Decl., Ex. N, p. 1.)  He was evaluated and monitored for treatment with dofetilide, which successfully converted him to a normal sinus rhythm.  (*Id.*)  Mr. Grinsell remains on dofetilide, which requires close monitoring. (*Id.*)  Sudden changes in the dosing regimen of that drug can cause fatal heart arrhythmias. (*Infra.*)

25  [9] Pericardial effusion "is the accumulation of too much fluid in the double-layered, sac-like structure around the heart (pericardium)."  https://www.mayoclinic.org/diseases-conditions/pericardial-effusion/symptoms-causes/syc-20353720.  "If untreated, it can lead to heart failure or death."  *Id.*

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   coronary artery disease, which required implanting several stents. (*Id.,* at 2-3.)  Unfortunately, this

2   revascularization did not resolve his congestive heart failure, which has grown worse.

3        During the past year, Mr. Grinsell has been repeatedly hospitalized due to his deteriorating

4   cardiac health.  While on vacation with his wife in Hawaii during March 2017, Mr. Grinsell was

5   unexpectedly hospitalized for acute pulmonary edema.  After arriving in Hawaii, Mr. Grinsell's

6   wife, Gale, noticed that he had lost all muscle definition and believed this might be evidence that

7   he was suffering from congestive heart failure.  He was "hospitalized acutely for intravenous heart

8   failure therapy and diuersis. (Feuchtbaum Decl., Ex. K, p. 2.)  He had atrial fibrillation and had a

9   successful cardioversion to normal sinus rhythm[.]"  (Feuchtbaum Decl., Ex. O, p. 3.)  A chest x-

10  ray revealed that Mr. Grinsell's heart was enlarged and that he was experiencing congestive heart

11  failure. (*Id.*)

12       During August 2017, while attending the Shakespeare Festival, in Ashland, Oregon, Gale

13  Grinsell again noticed that Mr. Grinsell appeared in poor condition.  He was again treated for

14  worsening of his congestive heart failure ("decompensation of his congestive heart failure"). (*Id.*)

15       During December 2017, Mr. Grinsell was in the hospital for a scheduled cardiac ablation.

16  After his treating physicians determined that there was a likelihood that Mr. Grinsell had a blood

17  clot in his heart, they decided that they could not perform the ablation and would be sending him

18  home. (Feuchtbaum Decl., Ex. N., p. 1.)  Gale Grinsell insisted that they first evaluate Mr.

19  Grinsell for congestive heart failure because she was concerned that he was retaining too much

20  fluid.  As that episode is described by Mr. Grinsell's cardiologist, Dr. Arnold Goldschlager, Mr.

21  Grinsell was "critically ill and had to be treated emergently for acute congestive heart failure."

22  (Feuchtbaum Decl., Ex. M., p. 1.)  Dr. Goldschlager notes that Mr. Grinsell's heart disease is

23  clearly progressive. (*Id.*)  He expresses concern that  Mr. Grinsell's "condition is perilous and he

24  is likely to develop acute congestive heart failure at a later date if he experiences emotional or

25  physical stress." (*Id.*)

26

27

28

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   During January 2018, Mr. Grinsell was hospitalized for treatment of his atrial fibrillation.

2   He was successfully treated with a drug, dofetilide (sold under the tradename "Tikosyn").[10]

3   Dofetilide can be used only after close monitoring of a patient over a 3-day hospitalization to

4   establish the correct does, and monitor both heart rate and kidney function.  (Feuchtbaum Decl.,

5   Ex. P, p. 21.)  Treatment "must be initiated (and, if necessary, re-initiated) in a setting that

6   provides continuous electrocardiographic (ECG) monitoring and in the presence of personnel

7   trained in the management of serious ventricular arrhythmias" for a minimum of three days.  (*Id.*

8   at 17.)  Dosage is titrated in micrograms.  (*Id.* at 17.)  Improper dosage could lead to an increased

9   concentration of dofetilide in plasma, which can result a tachycardia known as Torsade de Pointes,

10   which can lead to death.  (*Id.* at 9, 22.)  As Dr. Goldschlager noted: "In a situation of incarceration

11   it would be impossible to do the close follow-up and micro-adjustments of treatment which are

12   necessary to keep this individual alive."  (Feuchtbaum Decl., Ex. N., p. 1.)

13   As Dr. Goldschlager asserts that Mr. Grinsell's hospitalizations reflect that he is fragile and

14   that his cardiac condition is unstable.  (*Id.*)  His condition "requires extremely close cardiac

15   monitoring and obviously frequent re-hospitalization for worsening congestive heart failure and

16   arrhythmia."  (*Id.*)

17   **IV.   HEALTH CARE UNDER THE Bureau of Prisons**

18   We have engaged a consultant to help guide us in seeking designation to a Bureau of

19   Prisons ("BOP") facility where Mr. Grinsell would have the greatest probability of surviving a

20   period of incarceration.  Phillip S. Wise dedicated a twenty-five year career to the Bureau of

21   Prisons until he retired in 2002.  (Feuchtbaum Decl., Ex. Q, ¶ 1.)  He was the Assistant Director of

22   the Federal Bureau of Prisons, responsible for the health care provided by the agency.  (*Id.*)  He

23   served in several key positions that we believe provide him with insights that are likely critical to

24   someone with Mr. Grinsell's profile.  Among these, he was Warden of the BOP's Federal Medical

25

26   [10] Mr. Grinsell's cardiologist informed him that in about 30% of the cases, dofetilide will become
ineffective after a period of use.  If that were to happen, Mr. Grinsell would have to be
27   hospitalized to explore a different treatment for his atrial fibrillation.

28

1  Center at Rochester, Minnesota; he was the Warden of the Federal Prison Camp at Alderson, West

2  Virginia, and; he served on the BOP's Executive Staff, which is the Bureau's senior policy making

3  body.[11]  (*Id.*)

4       Having reviewed the PSR and relevant medical records, Mr. Wise believes that

5  incarceration would impose several challenges both upon Mr. Grinsell and upon the BOP:

6       • Mr. Grinsell's medical requirements will limit the available facilities to which he

7            can be designated.  This would likely result in Mr. Grinsell being incarcerated at a

8            place that is further from home.  (*Id.* at ¶ 5.)  It would also be likely to have him

9            placed at a more secure facility than he would otherwise be in.  (*Id.*)

10      • The medical care available for Mr. Grinsell will be less than what he is presently

11           able to obtain in his community.  (*Id.*)

12      • Some appropriate medical care, including access to medications, will be

13           unavailable to Mr. Grinsell, and Mr. Grinsell's medication regimen will be

14           changed.  (*Id.*)

15      • Administrative controls will substantially restrict Mr. Grinsell's access to medical

16           specialists.  (*Id.*)

17      • The BOP's difficulties in managing chronic medical conditions could result in a

18           disruption in the continuity of care.  (*Id.*)

19      • The BOP is ill equipped to manage the needs of elderly patients.  (*Id.*)  This would

20           likely create unique challenges to Mr. Grinsell.  (*Id.*)

21  **A.**    **Designation to an Appropriate Facility**

22      Two of the main factors that the BOP considers in designating an individual to a specific

23  facility are the person's security classification, and whether the person requires a greater amount

24  of medical care.  This designation has immense affect upon an inmate's conditions of confinement

25  _____

26  [11] Mr. Wise's experience is detailed more thoroughly in his resumé, which he included as

27  Attachment 1 to his declaration.  (Feuchtbaum Decl., Ex. Q, pp. 15-21.)

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   for the term of his imprisonment.  Based upon Mr. Grinsell's security factors that are described in

2   the PSR, he would be eligible for placement in a minimum security camp.  (Feuchtbaum Decl.,

3   Ex. Q, ¶ 6.)  Unfortunately, due to his chronic medical conditions, Mr. Grinsell would likely be

4   imprisoned under harsher circumstances.

5        The BOP assigns a care level designation to every facility.  Facilities designated as Level I

6   provide the lowest level of medical care.  They are populated with generally healthy inmates.  On

7   the other end of the spectrum, facilities designated as Level IV provide the greatest level of

8   medical care for the unhealthiest inmates, such as those requiring inpatient beds and twenty-four

9   hour medical care.  (*Id.* at ¶ 6.)  Due to his need for treatment with anticoagulants, and his need for

10  medical intervention more than once per month, under BOP criteria Mr. Grinsell would likely be

11  designated for a Level III facility.  (*Id.*)

12       Even though Mr. Grinsell would qualify for a camp, it is likely that a Level III designation

13  would result in Mr. Grinsell being sent to a place that has harsher conditions of confinement.

14  There are several Level III medical facilities that have adjacent camps, which could allow a

15  minimum security inmate to be assigned to the camp while receiving care from the Level III

16  facility. (*Id.*)  None of those are in California.  Further, the BOP recently began diverting

17  minimum security inmates who require greater medical care to the Level III facility itself, which

18  all have higher security classifications than the camps do.  (*Id.*)

19       Mr. Wise believes it is "very highly likely" that Mr. Grinsell's age and the complexity of

20  his medication regimen will result in the BOP placing him in the secure Level III facility, rather

21  than the adjacent camp.  (*Id.*)  Mr. Grinsell would be subjected to restricted movement within the

22  facility, strip searches before and after visits and community trips, and living with more criminally

23  sophisticated inmates, including those with a history of violence.  (*Id.*)

24       Mr. Grinsell's age would aggravate the difficulties of being designated to a more secure

25  facility than a camp.  He would find himself living among a prisoner population that is much

26  younger, louder, and more active than he is.  (Feuchtbaum Decl., Ex. Q, ¶ 20.)  He would have

27  limited opportunities to avoid interaction with these inmates, particularly in the dining facility and

28  visiting room.  (*Id.*)  A report issued by the National Institute of Corrections describes additional

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

difficulties experienced by older inmates, particularly those incarcerated for the first time at an advanced age.  (*Id.* at ¶ 22.)  As summarized by Mr. Wise, that report indicates that elderly inmates "have different medical needs with more chronic illnesses, they are more likely to become socially withdrawn, there are few programs or activities geared for that age group, and they are more subject to abuse or threats by other, younger inmates. They adapt to the noise and crowding of prison life more poorly and their physical needs such as mobility, temperature regulation, noise management, and diet and sleep management are more likely to be problematic."  (*Id.*)

A subsequent report, issued during 2015 by the Office of the Inspector General for the Department of Justice described what appear to be very significant deficiencies in the BOP's ability to adequately care for elderly inmates.  It noted that "[t]he physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates."  (*Id.* at ¶ 21.)  As one example of how the system fails to provide for a most basic need of the elderly and infirm, the report details that there are not a sufficient number of lower bunks in some institutions to accommodate the number of inmates whose medical conditions require that they have a lower bunk.  (*Id.*)

The harmful effects of incarceration upon the sick and elderly are likely to be especially severe for someone like Mr. Grinsell, who is prone to anxiety attacks, suffers agoraphobia, and has relied upon his wife to monitor his health and ensure he receives  treatment when that is necessary. Elderly inmates frequently tend to withdraw from interaction with others in order to avoid the associated difficulties.  (*Id.* at ¶ 9.)  So withdrawn that they are "sometimes referred to as 'cave dwellers,' these older offenders tend to minimize health care needs to avoid the difficulties of interaction with staff[.]"  (*Id.*)  "[They] remain primarily in their housing assignment, interact little with other inmates, participate minimally with staff, and as a result, receive little attention from institution staff."  (*Id.*)  Through his most recent critical cardiac events, which occurred without the stress of being incarcerated, Mr. Grinsell did not have the ability to recognize his own failing health, nor to act on it.  As an inmate, Mr. Grinsell's medical condition "will not be so closely monitored by prison staff."  (*Id.*)

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1      It is difficult to imagine someone like Mr. Grinsell receiving critical care when a chronic

2 condition becomes acute, as has occurred on several occasions in the past year.  Besides not having

3 the lifeline for seeking medical care that his wife has provided, incarceration seems likely  to

4 minimize the chance that Mr. Grinsell would obtain critical care when  time is of the essence.  His

5 anxiety issues and the burden of being an elderly inmate in a potentially hostile environment would

6 create a risk of Mr. Grinsell becoming a "cave dweller" who fails to recognize when help is

7 needed, and fails to seek it.

8      **B.**    **Medications Administered by the BOP**

9      The BOP attempts to limit the medications it administers to those that are on an approved

10 formulary.  (Feuchtbaum Decl., Ex. Q, ¶ 10.)  In those cases where an inmate is taking a non-

11 formulary prescription, the BOP may require an inmate try different medications for a period of

12 time, until finding one that is effective.  (*Id.* at ¶ 11.)  Or, it may require the inmate to try and fail a

13 non-pharmacological treatment before approving a non-formulary request.  (*Id.*)  Approval for a

14 non-formulary medication must be obtained from either the BOP Regional Clinical Director, or

15 from its Chief Pharmacist in Washington, D.C.  (*Id.* at ¶ 11.)  The process can be time consuming

16 for drugs that are not considered critical medications, as alternative therapies are attempted over a

17 period of months.  (*Id.*)  It seems that this trial-and-error approach can be hazardous for someone

18 with a serious chronic condition because the approval process could leave that person without a

19 clinically effective treatment during the period that alternatives are being sought, and; because it

20 could allow a treatable but progressive illness to worsen while the person is without effective

21 medication.

22      Twelve of the nineteen medications/supplements that Mr. Grinsell presently takes are <u>not</u>

23 on the BOP's formulary.  (*Id.* at ¶12.)  These include treatments for Mr. Grinsell's atrial

24 fibrillation, congestive heart failure (including the anticoagulant), depression, enlarged prostate,

25 and high cholesterol.  (*Id.*)  BOP policy would allow a staff physician to continue Mr. Grinsell's

26 "essential non-formulary medications" for only four days while the request for a non-formulary

27 medication is being considered.  (*Id.* at ¶ 13.)  However, if the BOP failed to consider the request

28 within that four-day period, or did not grant it, then "the BOP physician is required to either

1  discontinue the prescription or provide a 'therapeutic equivalent' available through the formulary."

2  (*Id.*)

3      Of particular concern for Mr. Grinsell is the uncertainty in his treatment due to the BOP's

4  exclusion of dofetilide from its formulary.  As described above, Mr. Grinsell's atrial fibrillation

5  has been difficult to treat and the improper administration of dofetilide can not only lead to

6  recurrence of atrial fibrillation, but it can also cause Torsade de Pointes, a potentially fatal heart

7  arrhythmia.  If the BOP did not timely consider and approve a request for use of dofetilide, after

8  four days it would need to begin the trial-and-error process with alternative drugs on the

9  formulary, in a search for effective treatment of atrial fibrillation.  Dr. Goldschlager is concerned

10  that the close follow-up and micro-adjustments of dofetilide treatment that are necessary to keep

11  Mr. Grinsell alive would be impossible to accomplish if Mr. Grinsell were incarcerated.

12  **C.      Chronic Care**

13      The BOP manages chronic care patients, like Mr. Grinsell, by enrolling them in "clinics,"

14  though that term is a bit of a misnomer.  (Feuchtbaum Decl., Ex. Q, ¶ 16.)  "'Chronic care clinics'

15  are not a physical location, nor are they a series of appointments with a medical specialist, but are

16  a computer based scheduling system designed to ensure that inmates with chronic conditions are

17  seen by a clinician on a regular basis to monitor specific conditions and provide changes to care as

18  needed." (*Id.*)  Unfortunately, these "clinics" do not function as intended.  (*Id.*)  The Inspector

19  General for the Department of Justice found that over 18% of the inspected BOP facilities failed to

20  monitor chronic care patients as required.  (*Id.*)  The report found that BOP failed to achieve its

21  goals for controlling high blood pressure, a condition that Mr. Grinsell suffers from, 21% of the

22  time.  (*Id.* at ¶ 17.)  It failed to establish target levels for high cholesterol (lipid management),

23  another condition that Mr. Grinsell suffers from, 60% of the time.  (*Id.* at ¶ 18.)

24      Staffing shortages further detract from the effectiveness of the BOP's care of inmates with

25  chronic diseases.  "A March 2016 report by the Inspector General of the U.S. Department of

26  Justice outlines the long standing difficulty the BOP has had and continues to have in recruiting

27  and retaining clinical staff." (*Id.* at ¶ 20.)  Making matters even worse, BOPs augmentation policy

28  allows BOP to use medical personnel to staff shortages elsewhere, such as assigning a nurse to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  monitor the recreation yard.  (*Id.*)  This lack of clinical staff would likely affect Mr. Grinsell by

2  disrupting the expected level of care available to him.  (*Id.*)  It would be a matter for speculation as

3  to the likely effect this lack of medical staffing might have upon Mr. Grinsell, if he were to suffer

4  an acute medical emergency like he has experienced in the past year, while a necessary clinician

5  was drawn away for some other task, like monitoring the recreation yard.

6  **D.  Limited Ability to See a Specialist For Serious Medical Deficiencies**

7  The BOP rations care where it may be necessary to see a specialist for medical conditions

8  "that are not immediately life-threatening but which without care the inmate could not be

9  maintained without significant risk of: serious deterioration leading to premature death; significant

10  reduction in the possibility of repair later without present treatment; or significant pain or

11  discomfort which impairs the inmate's participation in activities of daily living." (Medically

12  Necessary – Non-Emergent).  (Feuchtbaum Decl., Ex. Q, p. 24.)  An escorted trip must be

13  approved and arranged in advance.  (*Id.* at p. 25.)

14  The process for obtaining treatment by an outside specialist for Medically Necessary –

15  Non-Emergent health threats is rather bureaucratic.  First, the inmate would need a practitioner to

16  identify the inmate's medical problem and alert the staff physician.  (*Id.* at 22.)  The staff

17  physician then needs to determine that referral to a specialist is necessary.  (*Id.*)  If he determines it

18  is necessary, he then submits the request to the Utilization Review Committee for consideration.

19  (*Id.*)  Typically, that Committee convenes every two weeks to consider the referrals.  (*Id.* at 22.)

20  Thus, for any care that is not recognized as being emergent, there could be up to a two-week delay

21  before treatment  is even considered.

22  The Committee seems to place a priority on rationing referrals.  "The intent of these

23  committee reviews is to ensure that services outside the scope of those defined in policy **are not**

24  **provided** and to establish an initial assessment of priority for the recommended intervention.

25  Recently, the Bureau of Prisons has modified this procedure to require utilization review at the

26  Regional Office Level, and as a result, the number of escorted trips for inmates to see medical

27  specialists in the community has been reduced by 10%."  (*Id.* at 23) (emphasis in original).

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    Perhaps more disturbing, after approval, delivery of the care depends upon the number of

2    escorted trips that are available.  (*Id.* at 25.)  In order for an inmate to be seen by a medical

3    specialist such as a cardiologist or neurologist outside the facility for a non-emergency condition,

4    an escorted trip must be approved and arranged in advance. "The number of correctional officers

5    required for each medical escorted trip ranges from one to over five, depending on the

6    characteristics of the inmate involved. Because of staffing limitations, a facility will typically

7    schedule a limited number of medical escorted trips each day, and generally, the number of

8    inmates requiring such trips exceeds the number approved daily. Thus, even if care has been

9    approved, another inmate with higher priority needs, or the unavailability of escort staff could

10   delay treatment due to lack of escort staff."  (*Id.* at 25.)

11   This seems a particularly hazardous practice for a patient, like Mr. Grinsell, who has

12   suffered severe cardiac events where only his wife recognized that it was a potentially critical

13   event.  Compared to Mr. Grinsell's current medical care where he can self-refer to a specialist

14   when there is any concern he may be suffering a critical event, if incarcerated, Mr. Grinsell would

15   have to rely upon a series of conditional events in order to be approved for care by an outside

16   specialist, which could take a couple of weeks to be considered.  Then after getting approval for

17   that care, actually getting it can be further delayed based upon the availability of escort staff, and

18   the competing priorities presented by other inmates.

19   **E.       The Likely Effect Upon Mr. Grinsell of Medical Care Available Through BOP**

20   Mr. Grinsell's cardiologist, who has treated Mr. Grinsell for decades, believes it is likely

21   that "[a]s a result of the serious cardiovascular disease, congestive heart failure, obstructive sleep

22   apnea, chronic kidney disease, [Mr. Grinsell] would be seriously harmed if he were to be

23   incarcerated.  (Feuchtbaum Decl., Ex. K, p. 4.)  He believes that there is also a strong likelihood

24   that Mr. Grinsell would die in prison.  (*Id.*)

25   Mr. Wise provides the following opinion regarding the likely effects incarceration would

26   have upon Mr. Grinsell:

27            If incarcerated, Mr. Grinsell will find himself in a correctional
             setting that is ill equipped to manage inmates of his generation or

28           provide for their needs. He will likely be placed in a more secure

facility than a similarly situated healthy individual, and his access to medical care will be more limited, as will his access to medical specialists. His medical status will not be as closely monitored as it is by his wife, and may result in a delay in obtaining care for a serious condition. His medication regimen will be disrupted, with some medications discontinued, and some replaced with similar but different medications. His overall medical care will be disrupted and changed, only to be disrupted again, and re-evaluated when he is released back to the community.

(Feuchtbaum Decl., Ex. Q, ¶ 23.)

## V.    LEGAL JUSTIFICATION FOR A NON-CUSTODIAL SENTENCE

Variant sentences for serious medical issues may be justified under 18 U.S.C. § 3553(a)(2)(D) (noting that the court *shall* consider the need to provide needed medical care when imposing sentence).  Further, the Court should consider the added punitive effect that a custodial sentence would have upon Mr. Grinsell due to his age, the likely negative impact upon his health, the stress of being removed from family, and the likelihood that he would be incarcerated under harsher conditions than he would have if he did not suffer from serious medical conditions that limited the facilities to which he could be designated.  These factors would cause any custodial sentence to be greater than necessary to achieve the objectives under 18 U.S.C. § 3553(a)(2)(A)-(C).

In consideration of all the facts and circumstances, we respectfully urge the Court to grant a downward variance and to sentence Mr. Grinsell to probation with conditions including home detention, community service, restitution and a substantial fine.

DATED: April 19, 2018                    SIDEMAN & BANCROFT LLP


By:        /s/ Louis P. Feuchtbaum
_____
Louis P. Feuchtbaum
Attorneys for Raymond A. Grinsell

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711